Filed 6/27/24

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>JAGJIT SINGH,<br><br>      Defendant and Appellant. | F084642<br><br>(Super. Ct. No. BF177999A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Linnéa M. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II. of the Discussion.

# INTRODUCTION

Defendant Jagjit Singh was charged and convicted of first degree murder after he shot his daughter-in-law to death. During defendant's interview with the police after the crime, one officer translated the detective's questions into Punjabi and defendant's answers into English. Defendant discussed the details of the shooting and events leading up to it with the police. At one point, the questioning detective asked defendant if the shooting was an "honor kill." The defense at trial was defendant was provoked and he shot the victim in the heat of passion.

On appeal, defendant asserts the court erred in admitting his statement to police because it was taken in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) because a critical component of the warning was lost in the translation process. Relatedly, he asserts the court should not have concluded he impliedly waived his *Miranda* rights because the warnings were legally insufficient. He also contends the court prejudicially erred in instructing the jury inaccurately regarding provocation, and his counsel was ineffective in failing to request a pinpoint instruction that explained, to negate the mental state required for first degree murder, the provocation must be determined based upon the defendant's subjective perception of the acts of provocation. He also contends his interview with police, as translated, infused the trial with implicit bias in violation of the California Racial Justice Act of 2020 (Pen. Code, § 745 (Racial Justice Act or RJA)); undesignated statutory references are to the Penal Code) and defendant's due process and fair trial rights. He argues, if the issue was forfeited based upon a failure to object to the admission of defendant's interrogation DVD on these grounds, his counsel was ineffective on this basis.

We affirm.

# FACTUAL BACKGROUND

## CHARGES

Defendant was charged with committing first degree murder on August 26, 2019 (§ 187, subd. (a); count 1). It was further alleged the murder was willful, deliberate, and premeditated (§ 189, subd. (a)) and defendant personally and intentionally discharged a firearm which proximately caused great bodily injury or death to another person, not an accomplice, during the commission of the murder (§ 12022.53, subd. (d)).

## PROSECUTION EVIDENCE

### Defendant's 911 Call and Law Enforcement Response

On August 26, 2019, at 11:27 a.m., defendant called 911 and stated there was an emergency at his home. The People introduced the audio recording of the call at trial. The fire department initially responded to the call. They arrived at defendant's residence at around 11:35 a.m. Defendant answered the door. He did not appear to be in distress. Defendant directed them to the back of the house. Fire department captain Michael Taylor spoke with defendant as another firefighter and engineer went to the back of the house. The other two individuals returned and told Taylor they found a body. Taylor went in the room. There was a firearm—a .38-caliber revolver—on top of a table. The cylinder was open and it had been loaded with five bullets; three out of the five had been fired as evidenced by spent casings inside. There were seven live rounds of ammunition next to the gun on the table. Defendant's daughter-in-law, Sumandeep Kooner (Simi), was on the couch and she had gunshot wounds to her mouth, neck, and shoulder. It was later determined she was missing two teeth and the teeth were found on the scene. A cellular phone was located on her left arm. After the body was removed, police found a hole in the couch where they located a copper projectile.

Defendant said, "'I shoot,'" and he put his hand in his pocket and pulled out a handful of bullets, which he gave to Taylor. Taylor patted down defendant. Then,

3.

defendant sat down and watched television; he was calm. They waited for the police department to arrive.

Multiple officers arrived at the scene. Officer Gilbert Rodriguez detained defendant in the entryway of the home. He eventually accompanied defendant outside and defendant was transported to Kern Medical Center by ambulance for high blood sugar. As defendant was getting into the ambulance, Rodriguez noticed "very small, red drops on the front of his shirt." A photograph of defendant's shirt was introduced at trial. Defendant's wife, B.K., was found in the backyard of the house.

### Defendant's Arrest and Statements to Police

Sergeant Rob Robles interviewed defendant at approximately 9:00 p.m. on the day of the shooting. Officer Charanjit Singh was asked to translate during Detective Robles's interview of defendant. The interview was audio- and video-recorded and the prosecution played it for the jury.

During the interview, when asked to slowly explain what happened, defendant began by giving a "little history." He stated his daughter-in-law, Simi, "had made some relations" with, and was talking on the phone to, a boy from India who had moved to England. Simi kept calling the boy and had made plans to leave her husband and their children. Simi stated her suitcases were ready and she was getting an apartment. Defendant learned of her plans because he heard her talking on the phone when they returned home from temple the day before. Simi was talking loudly, assuming no one was home. Defendant also found out the man Simi was talking to was not of good character. Defendant tried to explain to Simi that she had a beautiful family, two kids, a job, a husband that worked, defendant and his wife, and she should not ruin her home; "[e]verything is good."

Simi got mad at defendant and told him not to give her advice. She told him she would pull off his beard and "shove it up [his] ass." Defendant got mad and begged her

4.

to stop; he touched her feet, which meant asking for forgiveness. She did not acknowledge him touching her feet. Defendant then got a gun from his room and put it in the pocket of his pants. When he returned, Simi told defendant she was going to rip off her clothes, call the police, and tell them he tried to sexually assault her. She began to rip her clothes and picked up her phone. Defendant got angry that Simi was about to expose her chest, explaining "a father will never see his daughter naked." He then shot and killed her. He fired the first shot when he was standing behind Simi and she was sitting on the sofa; he aimed at her neck. He walked around the sofa and then shot her twice from the front. Then, he put the gun on the table and called law enforcement. He stated he knew he had done something wrong and would accept whatever the court decides.

During the interview, Detective Robles asked defendant if Simi "dishonor[ed] him." Defendant responded that she disrespected him about his beard and, when she started pulling off her shirt, it is like a daughter doing that in front of her father, which is "a shame" and "the father will either shoot himself or her." At that point, Detective Robles asked defendant if it was "an honor kill." The following exchange, including Officer Singh's translations, then took place:

> "OFC. SINGH: Honor, or you can for your honor … for your dignity…
>
> "[DEFENDANT]: Honor is also in danger.
>
> "OFC. SINGH: Yes.
>
> "[DEFENDANT]: Because I was also…
>
> "OFC. SINGH: I did it for my honor."

At the end of the interview, when asked by the officers how he was treated during the interview, defendant responded that they did "very well."

### *Other Trial Evidence*

At trial, defendant's wife B.K. testified, in the morning of August 26, 2019, she went outside to cook on the outdoor stove; defendant was watching television in the house when she left. At some point, B.K. fainted. When she awoke, the police had taken her inside. She denied hearing anything while she was outside, but later admitted, on the day of the shooting, she reported to police she had heard a loud popping sound that sounded like a firecracker.

B.K. testified she and defendant have three daughters and one son. Defendant and B.K. lived with their son, G.K., and his family. G.K. was married to the victim, Simi. G.K and Simi had a daughter, D., who was 13 years old at the time of the trial, and a son, V., who was 10 years old at the time of the trial.

B.K. testified she viewed defendant as the leader of the house even though it was G.K.'s and Simi's home. B.K. had a good relationship with G.K. and they did not fight. B.K. met Simi in 2008 and, initially, they had a good relationship, too. B.K. denied seeing G.K. and Simi argue, but eventually testified they started arguing about a year before Simi's death and it slowly increased. Simi started using profanity toward defendant, B.K., G.K., and her children, and she "used to beat up the children." B.K. testified, starting about three months prior to her death, Simi used to pull B.K.'s hair out. Simi was on the phone more in the month leading up to her death talking to a man who was not her husband. Simi's demeanor also changed in the year leading up to her death. She changed the way she and the children dressed and she cut her own hair and the children's hair, though as Sikhs they did not believe in cutting hair. It was hard for defendant and B.K. to take the children to the temple after Simi cut their hair. Eventually, Simi would not allow the children to go to the temple and would take them away when B.K. was praying. She would blow out a religious candle defendant and B.K. would light in their prayer room each morning and turn off their religious hymns. Simi would also lock the door to her room so G.K. would have to sleep on the sofa.

6.

B.K. testified they had a pistol lying around the house, but when the "problems" started, defendant told her they should not keep it there because "she would use it on us." B.K. also stated she "used to hide the gun" because she was worried defendant, G.K., or Simi would get angry and use it. During an interview with Detective Robles after the shooting, B.K. reported that defendant had threatened to slap Simi during the four to five months before the shooting if she did not "stay quiet." B.K. never mentioned Simi had been physically abusive to anyone in the family in the past.

At trial, G.K. testified his relationship with Simi also changed approximately five to six months before her death. It got worse approximately one month before her death; Simi would not speak to G.K. or let him into their room to sleep. Simi would fight "too much" about "small, little things in the house." She would "always be on the phone," and she told G.K. in front of their children that "she was talking to her boyfriend." She would talk on the phone about leaving and she personally told G.K. that she was going to leave because she had a boyfriend. In the five or six months leading up to the shooting, Simi started insulting B.K. and defendant. She told G.K. to kick them out of the house.

G.K. denied being in the house when Simi was killed and he denied killing her. He testified he took the children to school that morning, returned home to finish his tea, and then he left again. Simi was sleeping still when he left for the second time.

The coroner who evaluated Simi's body observed three through-and-through gunshot wounds. The first traveled through the neck bone and part of the spinal cord. There was no evidence the tip of the barrel of the gun was closer than about 18 inches based upon the lack of soot and stippling. Simi's upper central jaw was severely fractured as a result of an exiting projectile. The second gunshot wound went through the neck, throat, and spinal cord. There was a muzzle stamp on the surface of the skin but there was no stippling present, which suggested the tip of the barrel of the gun was against the skin surface, so the projectile, hot gunpowder, and soot all went into the wound. The third gunshot entered just below the second and it also traveled through the

throat and the spine in the neck and exited out of the upper back; it had a "bit [of a ] downward" trajectory. Based on the soot around the muzzle stamp, the tip of the barrel of the gun did not appear to have been "as tightly pressed into the skin for [gunshot wound] number three." All the gunshot wounds were lethal and would have resulted in death within seconds. The "manner of death" was determined to be homicide and the "cause of death" was listed as "multiple gunshot wounds."

The trigger of the firearm was found to have DNA from a single female source, and the grip was found to have a mixture of DNA from at least three people. Simi could not be excluded as a potential contributor to the DNA profile obtained from the firearm's trigger; B.K., G.K., and defendant were all excluded as potential contributors. The trigger is not usually an area where a lot of DNA is found because it is a small area and it is smooth, so there is less friction. Defendant, G.K., and Simi could not be excluded as potential contributors to the DNA profile obtained from the firearm's grip and Simi could not be excluded from the major portion of the DNA profile obtained from the firearm's grip. Simi could also not be excluded as a contributor to DNA obtained from the shirt with blood droplets on it.

**DEFENSE EVIDENCE**

Harvinder Singh Bhullar testified regarding defendant's character, stating defendant is peaceful and helpful. They had known each other since 1993 when they met at temple and they interacted both socially and religiously. Bhullar testified defendant is Amritdhari, which refers to a particular group among Sikhs.

Before trial, the court held retained defense witness Dr. Laljit Sidhu qualified as an expert on Punjabi culture and the Sikh religion and that his testimony was relevant "for the jurors to have a better understanding of the overall circumstances in which the defendant found himself." At trial, Dr. Sidhu testified he has a doctorate in psychology and a background in clinical psychology. He was born in India and identifies as Sikh. He testified he grew up in a relatively traditional Indian family, was immersed in the

8.

culture, went to temple, and is fluent in the language. Additionally, as a professional psychologist he is required to understand "cross-cultural issues," and he has focused on how Indian populations engage in offending.

Dr. Sidhu testified Punjab is a rural agrarian area in India similar to California's Central Valley. As a result, it "tends to be a very collectivist culture," unlike Western societies in which individuality is paramount. In collectivist cultures, the notion of reputation and status is extremely important. Punjabi culture is a "culture of honor in the sense that when a person is engaging with other people, … their reputation is what defines how that relationship is going to go." "So it becomes extremely important in these types of cultures for a person to maintain that reputation, to maintain that status, to avoid anything that would reduce their reputation, that would be dishonorable to them or would somehow reduce their status." And the behaviors of an individual person within a family inherently reflect on the family more broadly. Punjabi culture also tends to be very patriarchal and hierarchical; males tend to be dominant, in a position of decisionmaking and power. Gender norms are fairly well established and elders are given more power and respect. Households are typically multigenerational. When older sons marry, their wives move into the household with the son and parents.

Dr. Sidhu explained the five symbols or K's of Sikhism—a special cotton undergarment, a comb to maintain your hair and beard, a steel bracelet, a ceremonial sword, and the rejection of cutting hair. Dr. Sidhu testified, when a person cuts his or her hair, it is an act of sacrilege because the beard and the hair are deeply intertwined with the faith itself. He explained, a threat to cut off a Sikh person's beard is significant and offensive. Amritdhari is a specific group of Sikhs who are more devout in following the tenets, morals, and strictures of the faith.

D., the daughter of Simi and G.K., also testified on behalf of the defense. She was 10 years old when her mother died. D. testified she noticed a change in her mother at some point in the year before her death. She also noticed her parents were fighting more

9.

frequently; her mother would yell at her father "[a] lot," "probably every single day." D. overheard a conversation between her mother and someone on the phone and learned her mother was having a relationship. Simi would "talk to him a lot." Simi would lock herself in a room and not let G.K. in. D. testified she did not get along well with her mother. Shortly before her death, Simi would speak "really bad about" D. and hit her. D. observed Simi yelling at her grandparents—defendant and B.K. Simi did not want D. to practice religion and she asked D. to cut her hair.

**VERDICT**

Following the presentation of evidence, the jury convicted defendant of first degree murder (§ 187, subd. (a)) and found true allegations that the crime was done with premeditation and deliberation within the meaning of section 189 and defendant personally and intentionally discharged a firearm in violation of section 12022.53, subdivision (d) and he personally used a firearm withing the meaning of section 12022.5, subdivision (a).

In a bifurcated proceeding, the jury also found true the following aggravating factors: defendant committed a crime that involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness, within the meaning of rule 4.421(a)(1) of the California Rules of Court; he was armed with or used a weapon at the time of the crime, within the meaning of rule 4.421(a)(2); and the victim was particularly vulnerable within the meaning of rule 4.421(a)(3). The jury could not reach a unanimous decision as to the allegation that defendant took advantage of a position of trust or confidence to commit the offense within the meaning of rule 4.421(a)(11), so a mistrial was declared as to that allegation. The court sentenced defendant to 25 years to life enhanced by 10 years pursuant to section 12022.53, subdivision (b).

DISCUSSION

Defendant now raises multiple challenges to his convictions.  For the reasons that follow, we reject each contention in turn.

## I.      Alleged *Miranda* Violation

Defendant first contends the trial court erred in admitting his statements to police which he alleges were taken in violation of *Miranda*.  We disagree.

### A.      Relevant Procedural History

As discussed, police conducted a recorded interview with defendant on August 26, 2019, during which Detective Robles questioned defendant and Officer Singh served as a translator.  At the outset of the interview, Officer Singh told defendant in Punjabi (as translated in the stipulated transcript), "we will tell you a little bit about your rights, whenever we have to question anybody, it is important for us to tell this, if we have to do question answers then we have to tell this.  It is important from the government side to do this.  Do you understand?"  Defendant can be seen in the video recording nodding and making an audible sound in response.  The following exchange then took place as detailed in the stipulated transcript:

> "DET. ROBLES:  So I would talk to you a little bit about what's going on but before we do so, I do need you to specify his rights.

> "OFC. SINGH:  We want to ask you about what happened but before that it is important for us to tell you this.  OK?

> "DET. ROBLES:  You have the right to remain silent.  Do you understand?

> "OFC. SINGH:  If you want to remain silent then you do not have to speak.  Do you understand what I have just told you?  Did you understand it?

> "[DEFENDANT]:  Yes.

> "DET. ROBLES:  Anything you say may be used against you in court; you understand?

11.

"OFC SINGH: Whatever statement you give us, it is your statement and we can use it in court whenever there is the court date. Do you understand?

"DET. ROBLES: You have a right to have a presence of an attorney before answering the questions. Do you understand?

"OFC SINGH: Whenever we have questions and answers from you, you can bring an attorney if you want. Do you understand?

"DET. ROBLES: If you cannot afford an attorney, one will be appointed for you, free of charge, for any questioning if you want. Do you understand?

"OFC. SINGH: If you cannot hire an attorney, if you do not have the money to do it then the government will provide you with an attorney if you like, for this question-and-answer session. Do you understand?

"[DEFENDANT]: Yes, it is alright."

Defendant can be seen in the video nodding in response to Officer Singh's statements.

Detective Robles then proceeded to interview defendant regarding the shooting. As detailed, defendant admitted to shooting Simi during the interview and he explained the circumstances surrounding the shooting. Before trial, defense counsel requested an evidentiary hearing regarding statements defendant made in the interview with police, to firefighters, and/or in the 911 call. Defense counsel also moved in limine to suppress defendant's statements to detectives on the grounds defendant did not sufficiently waive his *Miranda* rights.

The court conducted an Evidence Code section 402 hearing. Before the hearing, the parties stipulated "that in terms of the Miranda portion of the interview that the translation is indeed correct." Officer Singh affirmed he was the translator/interpreter during Detective Robles's interview with defendant. To Officer Singh's knowledge, defendant was not under arrest at that time; they were still investigating and had not told defendant he may be charged with murder.

12.

During the Evidence Code section 402 hearing, Officer Singh testified he was born in India and could read, write, and speak in Punjabi. He was certified through the Bakersfield Police Department to translate Punjabi interviews. He was not aware of there being a *Miranda* card in Punjabi. Singh testified, in the Punjabi language "[e]ach individual has to be advised of Miranda in a different way. As [defendant], he's an older individual, I would have to explain it to him in a different way as I would if someone was 25 to 30 years old." He explained this is because, from his experience, the majority of the older Indian community members "have not gone to any school so you have to explain it to them a certain way than versus … an individual who is 25 to 35 years old now, they would understand … what I mean when I say 'court,' instead of a person that's never been to school, it would be kind of hard to explain it to them …." He also explained that some things cannot be translated verbatim but must be explained "in context." Officer Singh testified, he had small talk with defendant before reading him his *Miranda* rights and asked him if he wanted water. It appeared to Officer Singh that defendant understood the questions being asked and his explanation of the *Miranda* rights. Defendant "acknowledged the first question and gave … nods on the follow-up two questions, and on the third one he actually said he understood." Officer Singh testified that nodding is a common way of saying "'yes'" in the Punjabi language. After being read his rights, defendant told the police about the incident and responded to their questions. He never stopped the 48-minute interview, asked for an attorney, or said he did not want to talk anymore.

When defense counsel asked Officer Singh why his translation "le[ft] out the portion that his statements can be used against him," Officer Singh responded that "[i]f you translate it properly, just saying 'Your statement can be used against you,' … [i]it doesn't make any sense." Rather, he put the phrase "in a context that [defendant] would understand." Defense counsel asked Officer Singh why he did not use particular language stated in Punjabi to convey the statement. Officer Singh responded that he

understood the Punjabi statement made by defense counsel to mean, "your statement can be overturned," "your statement can be manipulated," "basically saying we can use your statement, manipulate it, and turn it against you," and it would not make sense.

In arguing for the admissibility of defendant's statement, the prosecutor asserted "there are no magic words for Miranda advisal. All that is required is that it was a knowing, intelligent, and voluntary waiver." She argued defendant nodded his head, which Officer Singh testified is a common way to say "'yes'" in Punjabi culture, or defendant verbally said he understood when Officer Singh was translating each of the *Miranda* rights. Then, defendant's willingness to talk and to keep talking about the incident for 44 minutes implied "he waived those rights and wanted to speak to the officers about the incident that occurred."

Defendant's counsel asserted two arguments:

"First is the inadequacy of the *Miranda*, and, second, that the *Miranda* waiver was not done intelligently and knowingly.

"The primary issue … is that Detective Robles states any statement may be used against him in a court of law, and … Officer Singh translates that portion of the *Miranda* statement by saying 'Whatever statement you give us, it is your statement, and we can use it in court whenever there is the court date.'

"I understand that there are no magic words, … but the question is in what manner is it going to be used? Is it going to be used against [defendant]? Is it going to be used for him? Is it going to be used to reduce his bail?

"[Defendant] gave up his rights, but was unaware of the extent of what his statements were going to be used for, and it's the defense's opinion that when Detective Robles says anything you say can and will be used against you, the primary purpose of that statement is to apprise the defendant that it will be used against him. That wasn't done here.

"Moving on to the second argument, that it was done knowingly and intelligently, … if you look at the totality of the circumstances, … he was unaware of the extent to which the statements were going to be used.

14.

"As Officer Singh had stated …, he has to … provide more context for elderly people because they have some lack of education. They immigrated to this country later. [¶] In this instance, [defendant] did immigrate to the country later. He has very little … understanding of the legal system …. And taking all of those things into account, … [defendant] … did not give up his rights knowingly and intelligently …." (Italics added.)

The court held defendant's statement was not taken in violation of *Miranda* and was admissible during the trial. It found:

"[W]hile the defendant participated in the interview, he was in custody, and, on that basis, before participating in an interview or an interrogation, he has the right to be informed of the *Miranda* advisal, as they are, as stated previously, prophylactic rights. [¶] It does appear to the Court early on in the interview, and certainly before anything substantive in nature was obtained, that the *Miranda* advisal was provided to the defendant.

"It appears further that Sergeant Robles read all of the rights that we are accustomed to in English, and based on Officer Singh's testimony, they were translated—at least the meaning of those rights were translated so that the defendant can appreciate the rights that were provided. [¶] When considering the translations, the Court does accept the representations in the transcript consistent with the stipulation entered into by both parties. [¶] The Court also considers the totality of the circumstances, including Officer Singh's reasons for why he did not utilize a technical translation, because, in his mind, as testified to, they would not have made sense to the defendant. So he used his best efforts, arguably, to explain the rights that were afforded to him in a manner in which the defendant would understand.

"During the course of the interview, it appears to the Court, based on the colloquy established between the defendant, Officer Singh, and Sergeant Robles, that there did not appear to be any struggling or confusion as to what was being asked or what was being translated. [¶] The communication during the course of the interview did appear to the Court, as an objective observer, that Officer Singh and the defendant were able to communicate effectively with one another.

"To a certain extent, the statements attributable to the defendant as a declarant, throughout this interview, does satisfy Evidence Code Section 1220, and, on that basis, those statements are admissible for the truth of the matter asserted therein. [¶] The statements attributable to

15.

Officer Singh and to Sergeant Robles, however, are not admitted for the truth of the matter asserted, but are only relevant in establishing meaning and understanding to the defendant's statements themselves. That is important when coming back to the *Miranda* advisal, which was provided early on in the exchange.

"Officer Singh translated 'You have the right to remain silent' as 'If you want to remain silent, then you do not have to speak.' That, in this Court's view, is a sufficient translation to explain to the defendant that he has a right to remain silent; that he does not have to speak if he chooses not to.

"Sergeant Robles then stated, 'Anything you say may be used against you in court.' Officer Singh's translation, again to enable the defendant to fully understand and appreciate this right, translates 'Whatever statement you give to us, it is your statement, and we can use it in court whenever there is the court date.'

"The purpose for the statement attributable to Sergeant Robles about 'Anything you say may be used against you in court' is important because it allows the suspect to understand that whatever he tells law enforcement officers very well may be introduced in a formal setting, such as a courtroom, in later proceedings. [¶] The statement as translated by Officer Singh certainly does make the same exact point as what is required under *Miranda vs. Arizona*, 'Whatever statement you give us, it is your statement, and we can use it in court whenever there is the court date.'

"In this Court's view, while it is not a direct or technical translation of what Sergeant Robles stated, it certainly does capture the same meaning and importance as incapsulated [*sic*] in that particular right, and for purposes of an advisal, the Court finds that Officer Singh's translation, as it relates to the meaning necessary to be conveyed, was sufficient to enable the defendant to understand that whatever statements the defendant makes to law enforcement at that time could be used in court whenever there is a court date. [¶] … [¶]

"*Miranda vs. Arizona* does not contain a script, so to speak, that requires law enforcement to stick to a particular script involving language that has been approved to use and work as a proper advisal. [¶] *Miranda vs. Arizona* does articulate those rights that are afforded individuals, such as the right to remain silent, as well as the right to have the presence of an attorney during any questioning, and affords law enforcement agencies enough latitude to be able to individually determine what language is best to use for those particular communities and their particular jurisdictions.

16.

"In this particular case, it is no different. While the Bakersfield Police Department does have a *Miranda* card—that is, a card that articulates for their law enforcement officers particular questions to ask suspects before interrogations begin if the suspect is in custody—it certainly is not one that is mandatory; that is, the language contained within the Bakersfield Police Department *Miranda*-issued card, while approved in some level and certainly does qualify for what is mandated and required by *Miranda vs. Arizona*, is not the only way and manner in which the advisal can be provided.

"For that reason, the Court recognizes that Officer Singh, being in a position to translate English into Punjabi, as well as the experience that Officer Singh has in the Punjabi language, could afford some latitude to make sure that the suspect—in this case, the defendant, in particular— would be in a position to understand those rights that are afforded to him, just as they are afforded to all others.

"On that basis, it does appear to the Court that Officer Singh's translation, wherein he testified that he was translating the meaning of what was being asked to the defendant so that the defendant could understand his rights, does satisfy the *Miranda vs. Arizona* obligation, and, for that reason, the Court will find that the *Miranda* advisal was appropriately provided to the defendant during the course of this interview.

"In determining whether the defendant knowingly, intelligently, and thereafter voluntarily waived his rights, the Court does look at the totality of the circumstances. [¶] It does appear that the defendant at times nodded his head in reference to questions 'Do you understand?' It further appears at times that the defendant audibly answered affirmatively, 'Yes, it is all right,' and so forth. [¶] To that, the Court does find that whenever the right was provided to the defendant in the manner in which Officer Singh elected to explain the meaning of the right, it does appear, based on the totality of the circumstances, that the defendant understood his rights. There were no questions involving ambiguity, at least in the translation, and the Court, based on the totality of the circumstances, will find that the defendant understood the rights that were provided to him through Officer Singh.

"In determining whether the defendant waived his rights, while it might be easiest if there was a written waiver, which would act as an express waiver, courts have found that dependent upon the continued participation of the suspect during the course of the interview, one can find that the suspect impliedly waived his rights. [¶] … [¶]

17.

"[B]ased on the totality of the circumstances, the Court will find that the defendant impliedly waived his rights by continuing to participate in the interrogation with Sergeant Robles and Officer Singh. [¶] For those reasons, the Court will find that the defendant did knowingly, intelligently, and voluntarily waive his rights and thereafter participated in an interview with law enforcement.

"As the proponent of this information, [Prosecutor], the Court will find that the defendant's interview, as played in this courtroom, is admissible during your case-in-chief." (Italics added.)

## B. Standard of Review

In *Miranda*, the Supreme Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation. Accordingly, a suspect in custody must be advised as follows: "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479.)

When reviewing a ruling admitting a confession, we accept the trial court's resolution of any factual dispute to the extent the record supports it, but otherwise we determine independently whether the confession was taken in violation of the rules of *Miranda* or was involuntary. (*People v. Duff* (2014) 58 Cal.4th 527, 551.) On both questions, the People bear the burden of proof by a preponderance of the evidence. (*Ibid.*) Similarly, we review de novo the trial court's denial of a motion to suppress a statement under *Miranda*. (*People v. Waidla* (2000) 22 Cal.4th 690, 730.)

## C. Applicable Law

### 1. Adequacy of *Miranda* Warnings

"The four warnings *Miranda* requires are invariable, but [the United States Supreme] Court has not dictated the words in which the essential information must be conveyed." (*Florida v. Powell* (2010) 559 U.S. 50, 60; accord, *California v. Prysock*

(1981) 453 U.S. 355, 359 (*per curiam*) (*Prysock*) ["This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant."]; accord, *People v. Suarez* (2020) 10 Cal.5th 116, 159 ["The high court has 'never insisted that *Miranda* warnings be given in the exact form described in that decision.'"].) "In determining whether police officers adequately conveyed the four warnings, … reviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."'" (*Florida v. Powell, supra*, at p. 60; accord, *Duckworth v. Eagan* (1989) 492 U.S. 195, 203 (*Duckworth*); *Prysock, supra*, at p. 361; *People v. Suarez, supra*, at p. 159; *People v. Samayoa* (1997) 15 Cal.4th 795, 830.)

In *People v. Bradford* (2008) 169 Cal.App.4th 843 (*Bradford*), the appellate court reversed the defendant's convictions of second degree murder and other offenses after concluding his statement to police should have been suppressed because he received inadequate *Miranda* warnings and he was harmed by the statement's admission. (*Id*. at pp. 845–846.) Specifically, it was undisputed in *Bradford* that the detectives failed to advise the defendant that his statement could be used against him in court before the defendant confessed to his involvement in the crimes. (*Id*. at p. 850.) The *Bradford* court rejected the People's assertion that defendant's comments during the interrogation, including his reference to incriminating himself, showed he was aware his statements could be used later, despite the failure of the detectives to so advise him. (*Id*. at pp. 850–851.) The *Bradford* court reasoned, *Miranda* "repeatedly characterizes informing a suspect of each of the four warnings as an '*absolute* prerequisite' to the admission in court of the suspect's statements to police. (*Miranda, supra*, 384 U.S. 436, 468, 471, 476, italics added.)" (*Bradford, supra*, at p. 851.) *Bradford* quoted *Miranda*'s explanation that, because "'[t]he Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the

availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact.' (*Miranda*, at pp. 468–469, fn. omitted.)" (*Bradford, supra*, at p. 851.)

The *Bradford* court discussed *Miranda*'s explanation of the purpose of the required omitted warning that "anything said during the interrogation can and will be used against the suspect in court." (*Bradford, supra*, 169 Cal.App.4th at p. 851.) "'[T]his warning is needed in order to make [the suspect] aware not only of the privilege, but also of the consequences of forgoing it. It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of the privilege. Moreover, this warning may serve to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.' (*Miranda, supra*, 384 U.S. at p. 469.)" (*Ibid.*)

The *Bradford* court concluded, "Because the detectives failed to give [the] defendant one of the four required *Miranda* warnings, his confession was inadmissible in the prosecution's case-in-chief." (*Bradford, supra*, 169 Cal.App.4th at p. 854, fn. omitted.) In so holding, it distinguished cases in which all four *Miranda* warnings were given, albeit imperfectly, in which courts permitted some latitude in the administering of the warnings and, at times, examined the record to determine whether the defendant understood the *Miranda* advisements after finding some form of each warning was given. (*Bradford, supra*, at pp. 852–853 [discussing *Duckworth, supra*, 492 U.S. 195, *People v. Samayoa, supra*, 15 Cal.4th 795, and *People v. Nitschmann* (1995) 35 Cal.App.4th 677].) The *Bradford* court explained "[t]he evidence of understanding was therefore used not as

a substitute for one of the four warnings, but rather to demonstrate that the defendant properly understood an arguably imperfect warning." (*Bradford, supra*, at p. 853.)

The *Bradford* court could not conclude the admission of the defendant's statement was harmless beyond a reasonable doubt, reasoning it was "beyond doubt that [the] defendant was the killer," but "evidence of his mental state at the time of the shooting [was] less clear cut." (*Bradford, supra*, 169 Cal.App.4th at p. 854.) And the defendant's confession was used by the prosecution for the specific purpose of removing doubts about his mental state, namely, he did not act in imperfect self-defense or in the heat of passion, and "[a] confession is uniquely powerful evidence." (*Id.* at p. 855.) Accordingly, its admission was not harmless beyond a reasonable doubt and mandated reversal of the defendant's convictions. (*Ibid.*)

In *Duckworth*, the defendant was advised: "'Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. *You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning.* You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you to go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you've talked to a lawyer.'" (*Duckworth, supra*, 492 U.S. at p. 198.) The *Duckworth* court held the defendant's statement about the crime given after these warnings was admissible because the warnings given "touched all of the bases required by *Miranda*" (*id.* at p. 203) and, "in their totality, satisfied *Miranda*" (*id.* at p. 205). In so holding, the *Duckworth* court rejected the argument the given warnings were insufficient in light of the statement, "We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you to go to court." (*Id.* at p. 198, italics omitted.) The court reasoned the referenced statement was accurate in that, under

Indiana law, counsel is appointed at the defendant's initial appearance in court and *Miranda* does not require attorneys producible on call. (*Id*. at p. 204.) Rather, the suspect must only be informed, as the defendant was, that he had the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one. (*Ibid.*)

### 2. Knowing and Intelligent Waiver

> "*Miranda* makes clear that in order for [the] defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel. [Citation.] [¶] It is further settled, however, that a suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. [Citation.] We have recognized that a valid waiver of *Miranda* rights may be express or implied." (*People v. Cruz* (2008) 44 Cal.4th 636, 667 (*Cruz*).)

"[U]ltimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*Cruz, supra*, 44 Cal.4th at p. 668.) This means relinquishment of the right must have been voluntary—it was the product of a free and deliberate choice rather than intimidation, coercion, or deception—and it must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. (*People v. Whitson* (1998) 17 Cal.4th 229, 247; accord, *Moran v. Burbine* (1986) 475 U.S. 412, 421.) "'Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.'" (*People v. Whitson, supra*, at p. 247, quoting *Moran v. Burbine, supra*, at pp. 422–423, fn. omitted.)

Important to the present case, "[a] suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights." (*Cruz, supra*, 44 Cal.4th at p. 667; accord, *People v. Medina* (1995) 11 Cal.4th 694, 752; *People v. Sully* (1991) 53 Cal.3d 1195, 1233.) This principle has been upheld by the United States Supreme Court, which explained: "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384–385 [finding implied waiver of *Miranda* rights].)

**D.    Analysis**

Defendant argues the trial court violated his federal and state constitutional privileges against self-incrimination (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) when it denied his motion to suppress the recording of his confession to police.

**1.    The Given Advisements Reasonably Conveyed the Rights Under Miranda**

First, he asserts the *Miranda* warnings as translated in Punjabi did not reasonably convey the meaning of *Miranda*. He contends Officer Singh's translation did not convey to defendant that his statements could be used "***against*** him" at trial. So it failed to capture the meaning of the consequence of defendant's failure to exercise his Fifth Amendment right to remain silent, making the warnings "legally insufficient."

Here, Officer Singh translated all of the *Miranda* warnings, including the statement, "[a]nything you say may be used against you in court," to "Whatever statement you give us, it is your statement and we can use it in court whenever there is the court date." Thus, the given advisements did not "'entirely omi[t]' … any information *Miranda* required [the detectives] to impart," as was the case in *Bradford*. (*Florida v. Powell, supra*, 559 U.S. at p. 62; see *Bradford, supra*, 169 Cal.App.4th at p. 854.) Rather, the "essential inquiry" here is "whether the warnings reasonably

23.

"'[c]onvey[ed] to [defendant] his rights as required by *Miranda*.'"" *(People v. Wash* (1993) 6 Cal.4th 215, 236–237; accord, *Duckworth, supra*, 492 U.S. at p. 203.)

Based upon our independent review of the record, we conclude the given advisements adequately conveyed to defendant his rights as required by *Miranda*. Said differently, though Officer Singh's translation did not include the term "against," the given warning sufficiently captured the meaning of the warning.

Initially, the trial court considered Officer Singh's "reasons for why he did not utilize a technical translation, because, in his mind, as testified to, they would not have made sense to the defendant." Accordingly, the court concluded Officer Singh "used his best efforts, arguably, to explain the rights that were afforded to him in a manner in which the defendant would understand," and it appeared "Officer Singh and the defendant were able to communicate effectively with one another." The record supports the trial court's finding. That is, Officer Singh is a certified Punjabi translator and he testified he tailored his translation to most effectively communicate with defendant. He also testified a literal translation of the challenged warning would not have made sense in context; rather, he translated the phrase using language that would convey the meaning. When posed with an alternate suggested translation by defense counsel, Officer Singh explained that he interpreted the proposed language as inaccurate in that it meant any statement given by defendant could be "manipulated." Significantly, the defense did not present any evidence to contradict Officer Singh's testimony or to establish there was a more technically accurate translation that could have been utilized in Punjabi.

And the given advisement sufficiently conveyed to defendant the consequence of forgoing the right to remain silent and speaking to the police by stating that law enforcement could use defendant's statements in court when there is a court date. (See *United States v. Pacheco* (D.Utah 2011) 819 F.Supp.2d 1239, 1241, 1245 [concluding advisement to the defendant, "*Anything* you tell me, I am going to put in the police report. That police report can be used in a court of law at a later date and time if need

24.

be," sufficiently warned the defendant of his rights and potential consequences of speaking]; *State v. Messino* (2005) 378 N.J. Super.Ct. 559, 577 [finding *Miranda* advisement adequate where the "defendant was told that his statements could be used in a court of law, which in substance informed [the] defendant that his statements could be used against him"]; see also *United States v. Crumpton* (6th Cir. 2016) 824 F.3d 593, 606 ["'[U]se of the term 'in court' certainly helps to ensure a suspect's awareness of both the 'consequences of forgoing' the privilege against self-incrimination and the fact 'that he is faced with a phase of the adversary system,' [citation], but it is not the only way to do so."].) Nothing in Officer Singh's translated statement suggested defendant's statement could only be used for a limited purpose, such as only on defendant's behalf or in a particular proceeding. Rather, on its face, the statement provided for broad use of defendant's statement in court by law enforcement, which included against defendant. (See generally *Prysock, supra*, 453 U.S. at pp. 360–361 [concluding given warnings that the defendant was entitled to speak to lawyer before being questioned and during questioning and that the defendant had right to appointed counsel at no cost adequately conveyed his right to appointed lawyer if he could not afford one prior to and during interrogation, noting "nothing in the warnings given [the] respondent suggested any limitation on the right to the presence of appointed counsel"]; see generally *People v. Wash, supra*, 6 Cal.4th at pp. 236–237 [concluding advisement, "'you have the right to have an attorney present before any questioning if you wish one,'" reasonably conveyed defendant's right to have attorney present during questioning though it deviated from standard form by failing to expressly state defendant had right to counsel both before and *during* questioning; rejecting argument language was so ambiguous or confusing as to lead defendant to believe counsel would be provided before questioning and removed once questioning began].) Accordingly, we conclude the warning as translated reasonably conveyed to defendant that anything he said could be used against him in a court of law.

The record further supports a conclusion defendant understood the consequences of speaking. During the interview, after explaining the circumstances of the shooting, defendant stated he knew he was going to go to jail. When asked during the interview what he believed should happen to him legally, defendant answered that whatever the court decided would be acceptable to him. Thus, defendant was aware at the time of the interview that he would be involved in adversarial court proceedings during which his punishment would be assessed. And such evidence supports our conclusion "that the defendant properly understood an arguably imperfect warning," that his statement could be used by law enforcement in court. (See *Bradford, supra*, 169 Cal.App.4th at p. 853.)

## 2.      Defendant Voluntarily and Knowingly Waived His Rights

Defendant also contends the totality of the circumstances does not establish he impliedly waived his *Miranda* rights. He argues the trial court found an "'implied waiver'" based upon defendant's nodding of his head "to a legally insufficient explanation of the consequence of failing to remain silent." Defendant asserts the prosecution failed to show his education level, whether he had experience with the California legal system, or that he was knowledgeable of the California and United States Constitutions. He contends, "Officer Singh gave no testimony about [defendant's] educational background, other than what he inferred from [defendant's] age." He asserts his nod coupled with the "insufficiency of the warning translated into Punjabi" based on the lack of advisement that his statement could be used against him, rendered the *Miranda* warnings legally inadequate. He also contends, as in *Bradford*, we should conclude the interrogation violated *Miranda* and it should have been inadmissible.

After conducting an independent review of the record, we conclude the totality of the circumstances surrounding the interrogation reveals defendant made an uncoerced choice to voluntarily and knowingly waive his *Miranda* rights when he continued to speak with detectives after he was informed of his *Miranda* rights and acknowledged his understanding. Initially, as discussed *ante*, we conclude defendant was adequately

26.

advised of his rights under *Miranda*. Furthermore, "'[o]n review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*.'" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269.) And here, the record supports the trial court's conclusion that defendant appeared to understand those rights and that he impliedly waived them. As defendant acknowledges, the audio- and videotaped recording of the interview reflects he verbally confirmed he understood he had the right to remain silent and that an attorney could be appointed to him if he could not afford one. And he nodded affirmatively in response to the advisements that he had the right to an attorney and that law enforcement could use his statement in court, when these rights were explained to him. Additionally, Officer Singh expressly testified nodding is a common way of saying "'yes'" in Punjabi. After the advisements were given, defendant discussed the shooting at length. His answers were responsive to the questions, evidencing his understanding and that the parties were effectively communicating with each other. Defendant never asked for an attorney, stated he did not want to speak to the police, or otherwise expressed a desire to end the interview. Defendant did not present any evidence of mental or other impairments at the suppression hearing nor does he point to anything else in the record, other than the advisements we have already held to be adequate, that would have raised questions about his ability to understand his rights as they were explained to him. Considering the totality of the circumstances, we conclude defendant's willingness to answer questions after acknowledging his understanding of his *Miranda* rights constituted an implied waiver of such rights and the waiver was knowing and intelligent. (See *People v. Hoyt* (2020) 8 Cal.5th 892, 932; accord, *Cruz, supra*, 44 Cal.4th at pp. 667–669.)

Accordingly, the People met their burden of proving defendant understood his rights, and he knowingly and intelligently waived those rights when he provided an

uncoerced statement to police. (See *Cruz, supra*, 44 Cal.4th at pp. 668–669 ["[The] defendant's responses to [the detective's] inquiries reciting his *Miranda* rights reflect a knowing and intelligent understanding of those rights, and [the] defendant's willingness to answer questions after expressly affirming on the record his understanding of … those rights constituted a valid implied waiver of them."]; *Berghuis v. Thompkins, supra*, 560 U.S. at p. 385 ["The record in this case shows that [the defendant] waived his right to remain silent. There is no basis in this case to conclude that he did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak."].) Thus, the trial court did not err in admitting defendant's statement to police, and its admission did not violate defendant's due process rights or his right to a fair trial.

We reject defendant's first contention.

## II.    Provocation Instruction[*]

Defendant next argues the court prejudicially erred by failing to instruct the jury that the test for determining whether provocation negates the specific intent required for first degree murder is subjective.

### A.    Relevant Factual Background

During the jury instruction conference, the parties discussed the defense's request for a voluntary manslaughter instruction based upon heat of passion as a lesser included offense. The court stated its tentative was to grant the request. The defense explained the instruction is aligned with the defense in this case. The prosecutor objected to the instruction asserting the defense had not "met their burden in asking for the heat of passion provocation [instruction] given that in this case the only conduct we have by the victim are words." The court explained, "In this particular case, the issue for the Court legally and the issue for the jurors factually is to determine whether provocation exists in

---

**\***    See footnote, *ante*, page 1.

28.

this case. [¶] [B]oth sides recognize[] that provocation has to be demonstrated both subjectively and objectively."

Over the People's objection, the court allowed the inclusion of jury instructions on the lesser included offense of voluntary manslaughter, heat of passion, or sudden quarrel. It found "quite a bit of evidence has been presented to the jurors to consider a situation where provocation can occur. It ostensibly comes from the interview that the defendant participated in where he was able to express the conversation between he and the alleged victim, specifically what the alleged victim was saying that was disrespectful or dishonoring and so forth. [¶] Additionally, and just as significantly, at least shown in the video recording the defendant also indicated through the video recording that there was some conduct attributable to the alleged victim in this case when threatening to allege him of sexual assault, false sexual assault. She was threatening to take off her shirt or rip her shirt or something to the effect that would substantiate the false allegations. That is certainly conduct that the jurors can consider, coupled with the words that the alleged victim used in this case, with some specificity, as stated by the defendant, to determine if provocation existed."

The jury was instructed on first and second degree murder (CALCRIM Nos. 520 & 521) and on the lesser offense of voluntary manslaughter based on heat of passion (CALCRIM No. 570). Pursuant to CALCRIM No. 521, the court instructed the jury that the People must prove defendant "acted willfully, deliberately, and with premeditation" for defendant to be guilty of first degree murder. It explained, in part, that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly."

The court instructed the jury on provocation with CALCRIM No. 522 (Provocation: Effect on Murder) as follows:

29.

"Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder, but was provoked, consider the provocation in deciding whether the crime was first- or second-degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

The court also instructed the jury with CALCRIM No. 570 on "Voluntary Manslaughter:  Heat of Passion–Lesser Included Offense" as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"One, the defendant was provoked;

"Two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"And, three, the provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion.  It can be any violent or intense emotion that causes the person to act without due deliberation and reflection.  In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient.

"In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Defendant did not request a pinpoint instruction on provocation, or any additional instructions amplifying or clarifying the provocation necessary to negate premeditation and deliberation such that it would reduce first degree murder to second degree murder.

During closing argument, the prosecutor argued defendant acted with premeditation and deliberation and, thus, committed first degree murder. She asserted defendant heard Simi talking about her plans to leave the day before the murder, but defendant waited until the next day, when no one was around, to confront her. She further noted there was no evidence Simi had packed her suitcases. The prosecutor stated, defendant reported Simi's comment about cutting off his beard and shoving it up his ass was disrespectful and made him mad, but he "tolerated" it. However, at that point, defendant "made the decision to go down the hallway and inside his room" and to "grab his gun." The prosecutor asserted that Detective Robles showed the jury how the revolver is loaded: "[w]ith a revolver you have to make the conscious decision. You load each round one by one by one by one." She argued the fact that a Ziploc bag with ammunition inside was found on defendant's bed supported a conclusion the firearm was not initially fully loaded and, instead, that defendant went to his room, opened the bag, loaded the gun, and then walked back to the living room with the gun concealed in his pocket. The prosecutor asserted Simi was sitting on the sofa "in a vulnerable position" when defendant returned. She argued, contrary to defendant's statement that Simi was

31.

"pulling her shirt up and talking about how she's going to call the police to report him for sexually assaulting her," Simi's shirt was not disheveled but instead "way below her waistline." Defendant shot Simi for the first time in the back of her neck and then, "[e]ven though … shooting her in the neck, can be a deadly shot, that's not enough for him. He then goes around and shoots her again two more times in the front of the neck." She emphasized that Simi was unarmed and defendant consciously and physically moved to the front of the couch to shoot her again as Simi was "bleeding from her mouth" and "her teeth are all over the room." She argued all three shots were "at lethal areas," which is "extremely significant." And defendant "was within a few inches of [Simi] when he stood over her and shot her for the second time," as evidenced by the muzzle stamp. He had "to be within inches" of her "to get all that blood on not only himself, but the firearm." She asserted that defendant showed "no remorse" and he never sounded distressed after the shooting. And, during his interview with police, "[h]e tells them that he had a choice and he killed her, and that is exactly what deliberation is. You weigh[] the consequences of your decision and you decide[] to do it."

She argued defendant was not guilty of voluntary manslaughter, asserting "[p]rovocation does not allow you to set up your own standard of conduct. What the defendant has done in this case is set up his own standard of conduct and saying that he should only be measured against himself and not against others. There's insufficient provocation in this case…. You can't start a fight or an argument and then expect to be able to take advantage and say that you were provoked."

In closing argument, the defense asserted defendant shot Simi in a "rash and impulsive moment." Defense counsel argued, defendant tried to talk sense into Simi. "And [Simi] responded to his request for harmony with vile, offensive, disrespectful, and sacrilegious remarks that were designed to personally anger, hurt, and provoke [defendant]. There are certain words and phrases or comments and actions that may cause or trigger anybody here to have a reaction, a negative response, to anyone. But

32.

[Simi] barraged a provocation that was personally brutal, scathing, and painful to [defendant] as much as a ten-pound pot of hot, scalding water falling all over his body." "Without thinking, his mind full of rage and anger, [defendant] made a rash and impulsive decision to kill [Simi] and he shot her three times." Counsel asserted it is clear in defendant's statement "something … triggers [defendant's] anger, and anger was the constant guide that basically caused him to do what he did in the end." The defense asserted defendant "had no plan" and instead acted on "impulse" and "there was one continuous act, one stream of consciousness" and he never calmed down or had the opportunity to cool off. Additionally, the provocation defendant faced "would have caused an individual of average disposition to have acted rashly and without due deliberation."

During the course of deliberations, the jury sent the court a note asking for the definitions of "'provocation'" and "'deliberate'" in more detail. After discussing with counsel, the court responded the jury should refer to CALCRIM Nos. 200, 570, and 521.

**B.      Standard of Review and Applicable Law**

"Provocation may … reduce murder from first to second degree." (*People v. Rivera* (2019) 7 Cal.5th 306, 328; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 384.) It has been held, "a subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime. [Citation.] But more is required to reduce malice murder to voluntary manslaughter. For that, an objective test also applies: the provocation must be so great that, in the words of CALCRIM No. 570, it 'would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.'" (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000–1001; see *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.)

33.

We review a claim of instructional error de novo.  (*People v. Parker* (2022) 13 Cal.5th 1, 66.)  "A trial court 'is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.'"  (*Ibid*.)  "A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant."  (*People v. Cross* (2008) 45 Cal.4th 58, 67–68; see *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475 ["relevant inquiry … is whether, 'in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to [the] defendant's prejudice'"].)  "'"[W]e must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]"'"  (*Sattiewhite, supra*, at p. 475.)

Notably, "an instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation … is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory.  [Citation.] The trial court is not required to give such an instruction sua sponte."  (*People v. Rivera, supra*, 7 Cal.5th at p. 328; accord, *People v. Thomas, supra*, 14 Cal.5th at p. 384.)

**C.    Analysis**

Defendant argues CALCRIM Nos. 520 (first or second degree murder), 521 (first degree murder), 522 (provocation:  effect on murder), and 570 (voluntary manslaughter) did not fully, fairly, and correctly instruct the jury on the law of provocation/heat of passion related to first degree murder.  He asserts these instructions did not inform the jury that when provocation is the basis for negating the premeditation and deliberation element of first degree murder, the provocation is considered based upon defendant's subjective intent.  He asserts the jury likely applied the objective test of provocation discussed in the voluntary manslaughter instruction in considering whether intent was negated with regard to the first degree murder charge.  In support, he asserts the jury

34.

struggled with the meaning of provocation and deliberation based on their request for more detailed definitions of these terms and then continued deliberating for three hours after the court's response. He contends, if the issue is deemed forfeited, his counsel provided ineffective assistance by failing to object to the provocation instructions or proposing a pinpoint instruction. The People respond, this issue was forfeited for failure to object and any alleged error was harmless. They also deny that defense counsel's failure to request a pinpoint instruction constituted ineffective assistance. We agree with the People and reject defendant's contentions.

Initially, courts have held CALCRIM Nos. 521 and 522—both given here—are correct and "[t]hey accurately inform the jury what is required for first degree murder, and that if the defendant's action was in fact the result of provocation, that level of crime was not committed." (*People v. Jones, supra*, 223 Cal.App.4th at p. 1001; see *People v. Hernandez, supra*, 183 Cal.App.4th at pp. 1333–1334.) That is, "CALCRIM Nos. 521 and 522, taken together, inform[] jurors that 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Jones, supra*, at p. 1001; see *Hernandez, supra*, at p. 1334.) "Provocation in this context is not a 'defense' but merely a theory of reasonable doubt as to required elements of first degree murder. [Citation.] Because an instruction on provocation relates to the legal elements of premeditation and deliberation, it is a "'pinpoint instruction"' that a court need not give on its own motion." (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 557.)

Accordingly, we cannot conclude the court erred in instructing the jury with the cited instructions. We also cannot conclude it was reasonably probable, as defendant contends, the instructions on murder, manslaughter, and provocation misled the jury to believe that, to reduce murder from first to second degree, provocation must meet the same objective reasonable person test that leads to a reduction to voluntary manslaughter. As discussed, the jury was instructed on first degree murder with CALCRIM No. 521,

which provides in part that for a murder to be first degree, it must be deliberate and premeditated and a "decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated." It was also instructed that provocation could reduce the degree of murder, pursuant to CALCRIM No. 522. We cannot conclude the jury would have understood the instructions as saying the test for determining whether a murder is first or second degree is the same as that for determining whether a defendant is guilty of voluntary manslaughter. Rather, the jury was also instructed that for a defendant to be guilty of voluntary manslaughter, the provocation must be of such a kind that a person of average disposition would have been provoked and defendant was subjectively provoked. And we "see no reasonable likelihood that the jury would have construed this language in a voluntary manslaughter instruction to alter the requirement—plainly stated in CALCRIM No. 521—that first degree murder must be deliberate and premedi[t]ated." (*People v. Ocegueda, supra*, 92 Cal.App.5th at p. 559; see *People v. Rogers* (2006) 39 Cal.4th 826, 880 ["In the absence of instructional errors such as were present in [*People v.* ]*Valentine* [(1946) 28 Cal.2d 121], the standard manslaughter instruction is not misleading, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder."].)

And we cannot conclude the prosecutor's closing argument when considered in conjunction with the instructions likely confused the jury. Defendant argues the prosecutor "misstated the law" and "conflated the standard pertaining to provocation that reduces a murder to second degree with the provocation that reduces a murder to voluntary manslaughter" by arguing:

> "Voluntary manslaughter has both an objective and a subjective element; so the conduct by the victim must be sufficiently provocative that it would cause a person of average disposition to act rashly or without due deliberation or reflection.
>
> "This is the part I'm talking about where [defendant] cannot set up his own standard of conduct. It is a person of an average disposition. For

36.

the subjective portion, he must have killed while under the actual influence of strong passion, and it can be any intense or violent emotion. It doesn't have to be anger. But if you are allowing him to say I killed her for X, Y, and Z reasons, you are allowing him to set up his own standard of conduct."

We disagree with defendant's contention. Rather, the referenced argument occurred in the prosecutor's rebuttal, after defense counsel asked the jury to find defendant "not guilty of first-degree or second-degree murder" and, instead, to find him guilty of voluntary manslaughter. On its face and in context, the referenced argument is clearly discussing the standard for assessing adequate provocation for defendant to be guilty of voluntary manslaughter and not murder. Indeed, the prosecutor never asserted the objective test for considering provocation applied when considering whether there was sufficient provocation to negate premeditation and deliberation such that defendant was guilty of second as opposed to first degree murder or otherwise urged the jury to misapply the law.

To the extent defendant argues a more specific instruction, namely a pinpoint instruction, should have been given informing the jury that the objective test did not apply to reduction of the degree of murder, defense counsel's failure to request such an instruction forfeited this claim on appeal. (See *People v. Jones, supra*, 223 Cal.App.4th at p. 1001; see *People v. Rogers, supra*, 39 Cal.4th at p. 879 [CALJIC No. 8.73, which relates evidence of provocation to specific legal issue of premeditation and deliberation is a "pinpoint instruction" that need not be given on court's own motion].) And we cannot conclude defense counsel provided ineffective assistance by failing to request such a pinpoint instruction.

A defendant claiming ineffective assistance of counsel "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).) In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

37.

assistance ….." (*Id.* at p. 689; accord, *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption the challenged action might be considered sound trial strategy under the circumstances. (*Strickland, supra*, at p. 689; *Dennis, supra*, at p. 541.) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.) Additionally, the defendant must also establish prejudice: "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim [of ineffective assistance of counsel] on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)

Here, "counsel could reasonably have concluded the instructions given adequately advised the jury, as we have, and that no further instruction was necessary." (*People v. Ocegueda, supra*, 92 Cal.App.5th at p. 561.) And, as discussed, we cannot conclude there is a reasonable probability the jury was misled by the given instructions, which accurately conveyed the applicable law. For the same reasons, we cannot conclude defendant was prejudiced by his counsel's failure to request a pinpoint instruction that the test for determining whether provocation as sufficient to reduce first degree murder to second degree murder is subjective. Rather, the given instructions, namely CALCRIM Nos. 521, 522, and 570, advised the jury of the elements of the crimes and no further instructions were necessary. Said differently, we cannot conclude it is reasonably probable defendant would have obtained a more favorable verdict had the referenced pinpoint instruction been requested and given. Thus, defendant's ineffective assistance of counsel claim also fails.

We reject defendant's second contention.

## III. Racial Justice Act and Fourteenth Amendment Claims

Defendant asserts for the first time on appeal that his conviction should be reversed because his police interview reflects law enforcement was implicitly biased and the introduction of the entirety of his police interview was inflammatory and prejudicial in violation of the Racial Justice Act (§ 745, subd. (a)(1) & (2)), and it rendered his trial fundamentally unfair in violation of the Fourteenth Amendment. He further contends, if the issue is deemed forfeited, his counsel was ineffective in failing to object on these grounds. We conclude the issue was forfeited and defendant has not established he received ineffective assistance of counsel. Accordingly, we reject his contentions.

### A. Relevant Factual Background

In his statement to police after the shooting, defendant detailed the events leading up to the shooting: he learned Simi had been speaking to another man and was going to leave his son and their children to be with that man; on the day of the shooting, he told Simi not to do this and she told him she was going to pull off his beard and "shove it up [his] ass"; she threatened to tell the police defendant sexually assaulted her and "[w]hen she began to rip her clothes," defendant "said if you have done this then I'm dead, then my son is dead," and he shot her. Then, the following exchange took place with Detective Robles questioning, Officer Singh translating, and defendant responding:

> "DET. ROBLES: Was [defendant] angrier about the disrespect she was showing or was he worried about the … the {unintelligible} of his reputation?

> "OFC. SINGH: Were you angry because of the way she was talking to you or the things that she was doing like ripping off her clothes and trying to frame you? Were you angrier with the way she was speaking with you?

> "[DEFENDANT]: First it was about my beard {unintelligible}…

> "OFC. SINGH: One thing it was about my beard…

39.

"[DEFENDANT]: I tolerated that {unintelligible} you would also do that[.]

"DET. ROBLES: Did she dishonor him?

"OFC. SINGH: In a way she was {unintelligible}

"[DEFENDANT]: She did a big thing about my beard. The beard is our greatest honor.

"OFC. SINGH: {unintelligible} one thing…. And then she disrespected my beard…

"[DEFENDANT]: Then when she started to pull off her shirt like this…

"OFC. SINGH: When she grabbed her shirt…

"[DEFENDANT]: Now, a daughter is doing this in front of her father … she was like a daughter, right?

"OFC. SINGH: She is like my daughter, right[?]

"[DEFENDANT]: So, if a daughter behaves like this in front of the father then that's a shame, then the father will either shoot himself or her.

"OFC. SINGH: And if your daughter is trying to rip off her clothes in front of you either you kill yourself or you kill her, so.

"DET. ROBLES: So, was it an honor kill?

"OFC. SINGH: Honor, or you can for your honor … for your dignity…

"[DEFENDANT]: Honor is also in danger.

"OFC. SINGH: Yes.

"[DEFENDANT]: Because I was also…

"OFC. SINGH: I did it for my honor.

"[DEFENDANT]: In America {unintelligible} for 27–28 years, I have respect here. She is the daughter in law of the family and I am begging you."

40.

Later, the following exchange took place:

"DET. ROBLES:  OK.  Again, we were not there but is there a reason why she would … start saying that my father-in-law is going to rape me, wanted [to] tear my clothes off, why did he not call the police to intervene if he was worried about stopping this from happening or did he decide she dishonored the family too much at that point?

"OFC. SINGH:  When she was saying that she was going to rip off her clothes why did you not call the police to tell them that she was doing like this and she is telling me this?  Why did you try to kill her?  Did you feel at that time that she had dishonored you and your family?

"[DEFENDANT]:  Stained my reputation, yes, yes.

"OFC. SINGH:  According to what reason, that she was ready to go with another man, was it because of this reason that it was a stain to your reputation?

"[DEFENDANT]:  She was already going with that man but then she was going to stain my reputation but I touched her feet and begged her…

"OFC. SINGH:  At that point it was for me … it was for my honor…  I begged her[.]"

After defendant stated he would have gone to jail if she had reported he sexually assaulted her, the police asked him whether he thought he would go to jail for shooting her and the following exchange took place:

"[DEFENDANT]:  If you are talking about someone going to jail…

"OFC. SINGH:  The thing about jail {Unintelligible}…

"[DEFENDANT]:  Then we consider it to be the most dishonorable thing that some daughter or sister one tries to entrap someone by false accusations.

"OFC. SINGH:  And if somebody and if she would have done that and called the police and I would have got in for sexual arrest and what kind of {Unintelligible}…

"[DEFENDANT]:  Then it would be a living death for me.

"OFC. SINGH:  What kind of honor is that…

41.

"[DEFENDANT]: I would have gone to jail in either case. Because for ordinary people I am {unintelligible}.

"OFC. SINGH: I could never show my face to anybody and {unintelligible}…

"DET. ROBLES: Does he feel that he overreacted in the situation or does he think he did what he needed to do based on his personal beliefs?

"OFC. SINGH: Do you feel that you have done something wrong or you did what was right? That you could have done something else? What do you think?

"[DEFENDANT]: Now I do feel that I have done something wrong but that {unintelligible}

"OFC. SINGH: I feel that now, that I did wrong but…

"[DEFENDANT]: Only I know the situation that I was in at that time and what I have been through."

Before the recording was played for the jury, the court noted, defense counsel expressed during a sidebar that they "have decided not to object to the recording or to the translations in the recording and so forth." The court then permitted defense counsel to explain on the record. Defense counsel believed it was "inappropriate" that defendant was asked during the interview "about the actions …, … how he felt about them, the legality of the action, whether or not he thought it was fair." However, "looking at it from the totality of the circumstances with respect to the statement," counsel believed it would be in their "best interest not to object to this portion and, for that reason, … did not make such a request."

The prosecution did not rely on "honor killing" as a theory of first degree murder at trial or discuss the concept in opening or closing argument, but the prosecutor showed the entirety of the audio and video recording of the interrogation in the case-in-chief.

As discussed *ante*, at trial the defense called Dr. Sidhu, an expert on Punjabi culture, who testified at length about the concept of "honor killing," and defense counsel asserted in closing that this was not an honor killing. In response to questioning by

42.

defense counsel, Dr. Sidhu testified "honor culture" is a notion within Punjabi culture. However, Westerners "tend to misinterpret the notion of what an honor killing is. There is this term that's used in the academic literature to orientalize things, to make an 'other' of things, to see other cultures in these monolithic terms. There's a tendency to believe that if a brown man kills a brown woman, it must have been an honor killing." However, "[h]onor killing is a very specific thing with[in] the academic literature. It's a very specific concept that has [a] very specific meaning. Even in cultures of honor, people engage in violence for all sorts of reasons. Domestic violence occurs. Family violence occurs. People get into fights. Not every single aspect of violence, even in an honor culture, … is necessarily honor violence."

He explained that honor killings do exist in Indian culture, but there are two forms of honor violence or killing: "One of them is killing or engaging in violence for revenge, because your honor has been impugned. You've been insulted…. This is where you've been insulted or your family's been insulted; so you engage in violence to regain that honor. [¶] The second form of honor killing, which is more likely to occur in Indian culture or cultures of honor, is what's called purification acts. In a collectivist society, honor is not solely of the individual as it is in Western societies. Honor is a reflection of the entire family. So if a woman—and it's almost invariably a woman—does something that's believed to have stained the honor of the family, that stain has to be cleansed, and so violence can be used—or violence will be used against that woman as a way of cleansing that stain. [¶] In those situations what defines the honor killing, again, is the particular characteristics. [¶] First, honor killings are planned. An honor killing isn't something that's done impulsively or without giving forethought, because an honor killing is a form of signaling. You are essentially telling the rest of society, the other people in your community, that, look, we understand that this person stained our reputation, but we're going to do something about it. We[, the group or family,] are going to punish this person. So please recognize that we are not really as shamed as that

43.

behavior may have done." He explained that "honor killing is a very specific thing." It "isn't just violence toward women; otherwise, almost any incident of domestic violence would be considered an honor killing because usually, even in situations of domestic violence, the man generally feels somehow insulted, emasculated, dishonored."

During cross-examination, the prosecutor asked Dr. Sidhu whether killing of a daughter-in-law or a daughter is common in the Punjabi community. Dr. Sidhu responded, "I would say honor killings unto themselves are extremely rare. It's one of the reasons why it's kind of a different difficult concept for people to understand. This is not a common practice." The prosecutor also asked Dr. Sidhu if it is common for a father-in-law to talk directly to his daughter-in-law regarding her cheating on his son. Dr. Sidhu responded, "I think the initial step is—again, this is looking at how other honor killings have occurred or other incidents like this have occurred, and generally it's the mother-in-law that will first talk to the daughter to try to explain, because cheating is infidelity, it has to do with sexual assault, it has to do with taboos, and it's going to be more comfortable. [¶] But if the behavior continues, if it escalates, then the disciplinarian of the household is still going to end up being the elder male; so they may, after consultation, after talking to the mother-in-law, the son, approach the daughter-in-law as well."

## B.      California's Racial Justice Act

In 2020, the California Legislature enacted the Racial Justice Act (Stats. 2020, ch. 317, § 3.5), which went into effect on January 1, 2021. Its declared intent is "to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California. Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (Stats. 2020, ch. 317, § 2, subd. (i).). The Legislature expressed its

intent not to punish implicit bias, "but rather to remedy the harm to the defendant's case and to the integrity of the judicial system," "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing," and "to reject the conclusion that racial disparities within our criminal justice [system] are inevitable, and to actively work to eradicate them." (*Ibid.*)

To that end, the Racial Justice Act provides, in relevant part, "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin. A violation is established if the defendant proves, by a preponderance of evidence, any of the following: [¶] (1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin. [¶] (2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful…."" (§ 745, subd. (a)(1)–(2).) The statute defines the phrase "'[r]acially discriminatory language" as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (*Id.*, subd. (h)(4).)

Pursuant to the Racial Justice Act, "A defendant may file a motion … or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a). For claims based on the trial record, a

defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence.  The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section.…"  (§ 745, subd. (b).)  Section 745, subdivision (c) provides a procedural structure for RJA motions filed in the trial court:  "If a motion is filed in the trial court and the defendant makes a prima facie showing of a violation of subdivision (a), the trial court shall hold a hearing.  A motion at trial shall be made as soon as practicable upon the defendant learning of the alleged violation.  A motion that is not timely may be deemed waived, in the discretion of the court." [1]

If, after a judgment has been entered, the court finds that a conviction was sought or obtained in violation of section 745, subdivision (a), "the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a)."  (§ 745, subd. (e)(2)(A).)  The provision permitting such a claim to be raised on direct appeal and authorizing a defendant to move to stay the appeal and request remand to the superior court to file a motion was added by the

---

[1]    In *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, the First Appellate District, Division Four, discussed the prima facie standard under the Racial Justice Act, drawing from the prima facie case concept as articulated in other contexts.  (*Finley, supra*, at pp. 20–24.)  The *Finley* court held, "a defendant seeking relief under the Racial Justice Act must state fully and with particularity the facts on which relief is sought and include copies of reasonably available documentary evidence supporting the claim.  The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records."  (*Id*. at p. 23, fn. omitted.)  "At the prima facie stage …, the trial court must consider whether the motion and its supporting evidence state facts that, '*if true*, establish that there is a substantial likelihood that a violation' occurred (§ 745, subd. (h)(2), italics added), and should not weigh the evidence or make credibility determinations, except in the rare case where the record 'irrefutably establishes' that a defendant's allegations are false."  (*Id*. at pp. 23–24.)  If the trial court determines the defendant had made a prima facie showing, it must conduct an evidentiary hearing where it may consider evidence and arguments submitted by the People, make credibility determinations, and weigh the evidence.  (See *id*. at p. 25.)

Legislature through Assembly Bill No. 1118 (2023–2024 Reg. Sess.) (Assembly Bill 1118), which became effective on January 1, 2024. (Stats. 2023, ch. 464, § 1.)

### C. Analysis

Defendant argues Detective Robles "initiated the questioning about honor killing, and it was the prosecutor [who] played the unredacted DVD of the interrogation for the jury at trial." He asserts Detective Robles's "investigation of this homicide as an honor killing" reflected implicit bias and violated the Racial Justice Act, specifically section 745, subdivision (a)(1), and the Fourteenth Amendment. In support, he asserts "[a]t the time the interrogation … began, Detective Robles knew nothing that would have indicated that this was an 'honor killing,' as opposed to an act of domestic violence, other than a brown man wearing a turban killed a brown woman" and "Dr. Sidhu's testimony proved, by a preponderance of the evidence, that it was based on a misconception resulting from implicit bias: that when a brown man kills a brown woman, it must be an honor killing." He contends honor killing "was not the prosecutor's theory of the case," thus, the references to it were irrelevant, inflammatory, and prejudicial. He argues the defense expert, Dr. Sidhu, testified honor killings are not impulsive, but are planned and the product of a decision made by the family or the elders of the village, and this testimony "combined with law enforcement's focus on honor killing, made playing the DVD of the interrogation at trial an invitation to the jury to follow the most direct route to a first degree murder verdict: honor killing." Defendant also asserts, "[i]n playing the DVD of this interrogation in her case in chief, the prosecutor violated [section 745,] subdivision (a)(2) because, even though she did not explicitly rely on the honor killing characterization in the DVD, the jury saw and heard the DVD as well as Dr. Sidhu's testimony that honor killings are not impulsive, but are carefully planned and deliberated." He asserts "[t]his shows prejudice as it is 'reasonably probable the trial outcome was affected' which is the standard applied to Racial Justice Act violations." He further contends the record on honor killing as a form of discrimination based on race

and/or national origin was adequately developed at trial to permit review of his Racial Justice Act and Fourteenth Amendment claims on appeal. He urges us to conclude both alleged violations of the Racial Justice Act "were shown by a preponderance of the evidence, requiring this Court to vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with section 745, subdivision (a)" and/or that "the Fourteenth Amendment violations were not harmless beyond a reasonable doubt" and require reversal of defendant's conviction. Finally, he argues his counsel provided ineffective assistance by failing to move to exclude or redact the recording of the interrogation on Racial Justice Act or Fourteenth Amendment grounds when he moved to exclude the record based on the alleged *Miranda* violations. He argues there was no tactical reason for counsel's actions and the failure to move to exclude the DVD of the interrogation was prejudicial under *Strickland, supra*, 466 U.S. at page 687, because it deprived him of a fair trial.

The People assert "Assembly Bill 1118 does not help defendant[] …, who was convicted after the RJA took effect, but who failed to make an RJA claim at trial." They contend Assembly Bill 1118 left intact language in subdivision (c) of section 745 that requires an RJA motion to be made in the trial court "'as soon as practicable upon the defendant learning of the alleged violation,'" with untimely motions subject to waiver. And that provision would serve no practical purpose if an RJA claim waived in the trial court could nonetheless be raised on appeal. They further contend Assembly Bill 1118 did not expressly preclude application of the forfeiture doctrine, and its legislative history "buttresses the conclusion that a defendant who could have brought a timely RJA claim at trial will remain subject to forfeiture on appeal." Accordingly, they contend defendant's claim was forfeited based on his counsel's failure to raise it at trial. Alternatively, they assert defendant's claim fails on its merits because the record shows Detective Robles's question about whether it was an honor kill "was not racially biased" in context. Rather, "[h]e chose the word 'honor' based on [defendant]'s preceding statements about status,

48.

respect, and his reputation." They argue that defendant "raised his cultural and religious background with the police" and "this was *not* a situation where the detective conjured up the notion of an honor killing upon seeing a 'brown man killing a brown woman.'" Additionally, defendant raised the issue before the jury and called an expert on Punjabi culture, Dr. Sidhu, who testified "one's sense of self is defined within one's position within the broader society in that culture, and highlighted the importance of reputation and status."

### 1. Defendant's Claim is Forfeited

Defendant contends his Racial Justice Act claim may be raised on direct appeal *for the first time* if supported by the trial record, and he urges us to exercise our discretion to conclude the issue is not forfeited and, instead, to consider the merits of his argument, citing *In re Sheena K.* (2007) 40 Cal.4th 875, 887–888, footnote 7 (*Sheena K.*), for the proposition that we may consider a forfeited issue that presents a pure question of law. We agree with the People that the issue is forfeited based upon defendant's failure to object at trial on this basis.

Here, defendant was charged by information on December 11, 2019. On April 11, 2022, the defense filed its pretrial motions in limine in which, in part, it requested an evidentiary hearing related to defendant's statement to police. The court subsequently held an Evidence Code section 402 evidentiary hearing on April 15, 2022, with regard to the police statement, during which the defense never argued for exclusion of the statement or redaction of the reference to an "honor kill" under the Racial Justice Act. Thereafter, the trial in this matter took place from April to May 2022—a year and nearly five months after the Racial Justice Act became effective. Defense counsel never raised an objection based upon the Racial Justice Act either during trial or posttrial in a motion for new trial.

As a result, on this record, we must conclude defendant forfeited his claim by failing to timely object below. Initially, it is true section 745, subdivision (b) was

49.

amended by Assembly Bill 1118, effective January 1, 2024 to permit a defendant to "raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence." But section 745, subdivision (c) expressly provides, "A motion made at trial *shall be made as soon as practicable upon the defendant learning of the alleged violation*. A motion that is *not timely may be deemed* waived, in the discretion of the court." (Italics added.) And at least one court has held that where, as here, the defendant could have but failed to raise his Racial Justice Act claim below, he forfeited the claim and could not raise it for the first time on direct appeal despite Assembly Bill 1118's amendment to section 745 permitting such claims to be raised on direct appeal. (See *People v. Lashon* (2024) 98 Cal.App.5th 805, 811–813 (*Lashon*).)

The *Lashon* court reasoned, "By the Assembly Bill 1118 amendment, the Legislature did not include any language indicating a section 745 claim could be presented on direct appeal *for the first time*. (*Lashon, supra*, 98 Cal.App.5th at p. 812.) It held, in the absence of such language, "review of a section 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court." (*Ibid*.) It reasoned, "[i]t makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue a section 745 claim for the first time on appeal." (*Id.* at p. 813.)

The *Lashon* court further concluded the legislative history of the statute "indicates the Legislature did not intend to allow a defendant to pursue such a claim for the first time on direct appeal where it could have been but was not raised in the trial court." (*Lashon, supra*, 98 Cal.App.5th at p. 813.) It reasoned, "[a]t the time the Legislature enacted Assembly Bill 1118, it was made aware of general appellate rules of preservation and forfeiture of issues on direct appeal, and exceptions to those rules as judicially

applied in analogous contexts." (*Ibid*.)  In support, the *Lashon* court referenced the explanation of Assembly Bill 1118's proposed amendments to the Racial Justice Act, including the clarification that a Racial Justice Act claim based on the trial record may be raised on direct appeal and that a defendant can request a stay and remand of the appeal:

> "'This may be necessary to permit the trial court to rule on the claim in the first instance, and to allow the parties to fully litigate the issue.  (See *Gray1 CPB, LLC v. SCC Acquisitions, Inc.* (2015) 233 Cal.App.4th 882, 897 ["[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court.  Thus, we ignore arguments, authority and facts not presented and litigated in the trial court"] (citation and quotations omitted); see also *People v. Welch* (1993) 5 Cal.4th 228, 237 ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence"].) …'  (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1118 (2023–2024 Reg. Sess.) as amended Mar. 15, 2023, pp. 5–6.)"  (*Lashon, supra*, at p. 814.)

The *Lashon* court found "it significant that the Legislature did not include any language to the effect that a section 745 claim may be raised on direct appeal 'for the first time,' which it could have easily done just as it did when amending the habeas corpus proceedings [in section 1473]."  (*Lashon, supra*, 98 Cal.App.5th at p. 814 [referencing a footnote in which it discussed the changes to the habeas corpus procedures].)  *Lashon* held, "Accordingly, taking into account the purpose of section 745—to swiftly and effectively address racial bias as soon as practical upon a defendant learning of an alleged violation—and 'the substantial state interest in protecting the integrity of the process from improper "sandbagging" by a defendant' [citation] along with the language of the statute and its legislative history, we conclude a defendant may be found to have forfeited a section 745 claim of racial bias made for the first time on direct appeal in the absence of a showing that an exception to the forfeiture doctrine applies."  (*Id*. at p. 815.)

We agree with the *Lashon* court's reasoning and conclude where, as here, defendant could have but failed to raise his Racial Justice Act claim below, it is forfeited.

51.

The Legislature could have, but did not, expressly declare that a defendant in such instances could raise such a claim on appeal *for the first time*. And, as the *Lashon* court explained, "[i]t makes little sense for the Legislature to prescribe a comprehensive procedure for making and adjudicating a section 745 motion at the trial level (including a specific waiver provision for untimely motions), only to allow defendants who could have but did not use that procedure (thereby preserving their claim for review) to bypass that procedure and pursue a section 745 claim for the first time on direct appeal." (*Lashon, supra*, 98 Cal.App.5th at p. 813.) Furthermore, in enacting Assembly Bill 1118's provision permitting a defendant to raise a Racial Justice Act claim on direct appeal, the Legislature left intact the language in section 745, subdivision (c) that "A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation." To permit a defendant to raise a claim on direct appeal where, as here, he could have but failed to timely raise it at trial would render the timeliness requirement set forth in section 745, subdivision (c) meaningless because, even if such a claim was not timely raised below, it could be raised for the first time on appeal. It is a "fundamental principal that a court should interpret a statute … so as to harmonize and give effect to all its provisions if such an interpretation is consistent with the language and purpose of the act." (*People v. Garcia* (1999) 21 Cal.4th 1, 10.) And finding forfeiture in a situation such as here harmonizes the statutory provisions (namely, § 745, subds. (b) and (c)) and gives each provision full effect. (See *In re C.H.* (2011) 53 Cal.4th 94, 103 ["We harmonize statutory provisions, if possible, giving each provision full effect."].)

This conclusion is further supported by the legislative history of Assembly Bill 1118, which reflects the Legislature's intent to permit consideration of claims on direct appeal based on the trial record, as opposed to by way of habeas corpus proceedings, to promote efficiency and conserve judicial resources. Permitting a claim to be raised on direct appeal for the first time when it could have been timely raised and remedied below

would be directly contrary to the goal of promoting judicial efficiency. For all these reasons, we agree with the *Lashon* court that "review of a section 745 claim, like any other appellate claim, is subject to the general appellate rules of preservation and forfeiture of claims that could have been but were not made in the trial court."[2] (*Lashon, supra*, 98 Cal.App.5th at p. 812.)

We also cannot conclude an exception to the forfeiture doctrine should apply. In *Sheena K.*, cited by defendant in support of his argument, the California Supreme Court held a constitutional challenge to a probation condition that presents "a pure question of law" and is "easily remediable on appeal by modification of the condition," may be raised for the first time on appeal. (*Sheena K., supra*, 40 Cal.4th at p. 888.) In so holding, the *Sheena K.* court distinguished claims of erroneously admitted evidence or prosecutorial misconduct where forfeiture is necessary for the sake of procedural efficiency and conservation of judicial resources, and held the *Sheena K.* defendant's failure to assert her constitutional claim in juvenile court did not have an impact on the same proceedings "'downstream.'" (*Ibid.*) The *Sheena K.* court cautioned that it was not concluding "'all constitutional defects in conditions of probation may be raised for the first time on appeal, since there may be circumstances that do not present "pure questions

---

[2] During oral argument, defense counsel argued for the first time that the use of the term "waived" as opposed to "forfeited" in section 745, subdivision (c), puts an obligation on the trial court to inquire whether the relinquishment of a Racial Justice Act claim is knowing, intelligent, and voluntary. We reject this contention. Rather, the plain language of the statute states: "*A motion that is not timely may be deemed waived*, in the discretion of the court." (§ 745, subd. (c), italics added.) It does not require the court to conduct such an inquiry before deeming a claim waived. Furthermore, as our Supreme Court has acknowledged, "Knowing and intelligent waivers are generally required when a criminal defendant gives up 'any significant right' [citation], such as the constitutional rights relinquished by a plea of guilty [citation], the right to counsel [citations], and the right to appeal [citation]." (*People v. Trujillo* (2015) 60 Cal.4th 850, 859.) Here, defendant has not argued a comparably significant right is at stake such as a core autonomy interest or a constitutional right. (See *ibid.*) Rather, for the reasons discussed, we conclude the general rules of preservation and forfeiture of claims that could have been but were not made in the trial court apply.

of law that can be resolved without reference to the particular sentencing record developed in the trial court." [Citation.] In those circumstances, "[t]raditional objection and waiver principles encourage development of the record and a proper exercise of discretion in the trial court.""" (*Id.* at p. 889.)

Here, defendant's Racial Justice Act claim that Detective Robles exhibited bias or that "racially discriminatory language" was used during the trial proceedings is not a constitutional challenge that presents a pure question of law as was the case in *Sheena K*. Rather, it necessarily requires reference to and consideration of the circumstances of the case and record below. (See *Lashon, supra*, 98 Cal.App.5th at p. 811.) And, as discussed, it would not be procedurally efficient, nor would it conserve judicial resources, to find an exception to the forfeiture doctrine in this context—where, as here, the trial court could have easily remedied the introduction of the allegedly objectionable evidence before trial. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1035–1036 [rejecting the defendant's argument forfeiture of prosecutorial claim was irrelevant because issue was """pure question of law""" presented by undisputed facts, noting "[The d]efendant's interpretation of that exception to the forfeiture rule would seem to imply that any issue reviewable de novo may be raised for the first time on appeal.… Such an exception would allow a defendant to invalidate an entire trial based on a claim of prosecutorial misconduct that could have been easily remedied by a timely objection and an admonition."].) Rather, given the circumstances of this case, we conclude general forfeiture rules apply and defendant's claim must be deemed forfeited.

### 2. Defense Counsel Did Not Provide Ineffective Assistance

Nevertheless, defendant asserts, should we conclude his claim is forfeited, his counsel provided ineffective assistance by failing to object or seek exclusion of his police interview based upon the Racial Justice Act. First, defendant argues his counsel "must have determined that it would benefit [the] defense to have his interrogation excluded for *Miranda* violations." Accordingly, "[t]here could be no tactical reason that exclusion on

*Miranda* grounds would benefit [defendant], but exclusion or redaction on RJA and/or Fourteenth Amendment grounds would not; accordingly, defense counsel was deficient in failing to move to exclude the DVD of the interrogation on all legally viable grounds."

"[W]hether or not to object to evidence at trial is largely a tactical question for counsel, and a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional right to the effective assistance of counsel would be an unusual one." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1312.) "An attorney may well have a reasonable tactical reason for declining to object, and '"[i]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation."'" (*Id*. at pp. 1312–1313.)

We can discern multiple reasonable tactical reasons why defense counsel may not have objected to defendant's statement to police and to the particular exchange related to Detective Robles's question regarding whether it was an "honor kill" based upon the Racial Justice Act. First, defense counsel could reasonably have concluded the statement, specifically the question about whether the shooting was an "honor kill," did not violate the Racial Justice Act. Rather, defense counsel could have reasonably concluded Detective Robles's question regarding whether the shooting was an "honor kill," in context, was a legitimate investigative inquiry into defendant's motive for the shooting or his state of mind, rather than evidence of Detective Robles's bias or animus and/or "racially discriminatory language," as defined by the statute. Accordingly, defense counsel could have concluded an objection on this basis would have been futile, particularly in light of defendant's preceding comments during the interview in which he stated, once the victim was going to expose herself he had no choice but to kill her or himself, and his discussion of the events leading up to the shooting in the context of his culture. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 804 ["[D]efense counsel's

decision not to file a motion he believes will be futile does not "'"substantially impair' … defendant's right to effective assistance of counsel."'"].)  Defense counsel could have also concluded an objection or redaction was not necessary in light of the anticipated testimony by the defense expert on Punjabi culture, Dr. Sidhu, who discussed the concept of "honor killing" and opined that the shooting in this matter was not an "honor killing." Additionally, the referenced exchange provided a further basis for the admissibility and relevance of the defense expert testimony, which defense counsel could have determined was critical to the defense theory that defendant was provoked.  Defense counsel could also have reasonably decided to not seek a redaction of the statement because the defense did not want the jury to think the defense was hiding anything from them.  Accordingly, we cannot conclude "this is one of those 'rare' cases in which counsel's failure to object amounts to constitutionally deficient performance."  (*People v. Bona* (2017) 15 Cal.App.5th 511, 522.)

Irrespective, defendant has not established he was prejudiced by his counsel's failure to object to the reference to an "honor kill" in defendant's statement to police under the Racial Justice Act and to seek redaction or exclusion on that basis.  Said differently, even if defense counsel had objected to defendant's statement to police on the grounds the reference to an "honor kill" and/or to his statement to police pursuant to the Racial Justice Act, we cannot conclude defendant has established but for counsel's error, "the result of the proceeding would have been different."  (*Strickland, supra*, 466 U.S. at p. 694.)

Initially, the record is far from clear the trial court would have found, by a preponderance of the evidence, that Detective Robles's question during the interview, in the context of defendant's statements, established Detective Robles "exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin," or was a use of "racially discriminatory language about the defendant's race, ethnicity, or national origin" such that it amounted to a violation of section 745,

56.

subdivision (a). (See *People v. Mattson* (1990) 50 Cal.3d 826, 876 ["[a] claim of ineffective assistance of counsel based on a trial attorney's failure to make a motion or objection must demonstrate not only the absence of a tactical reason for the omission [citation], but also that the motion or objection would have been meritorious"]; *People v. Wharton* (1991) 53 Cal.3d 522, 576 [rejecting argument that failing to bring motion established ineffectiveness; holding in order to prove prejudice under *Strickland*, the defendant must establish motion would have been granted]; see also *Kimmelman v. Morrison* (1986) 477 U.S. 365, 375 [under *Strickland*, a defendant must demonstrate a motion to exclude would have been "meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice"]; *People v. Gonzalez* (1998) 64 Cal.App.4th 432, 438 ["To establish prejudice [as a result of counsel's deficient representation,] … the defendant must do more than show the motion [to suppress] would have been meritorious…. [T]he defendant must show … the motion would have been successful."].)

Section 745 does not define the terms "bias" or "animus," but specifies that the moving party is not required to prove "intentional discrimination." (*Id.*, subd. (c)(2).) The legislative findings to the Racial Justice Act include a nonexhaustive list of potentially violative statements or conduct, including "racially incendiary or racially coded language, images, and racial stereotypes," and suggestion that people of a certain race are "predisposed" to criminal conduct. (Stats. 2020, ch. 317, § 2, subds. (d), (e).) The term "bias" is defined as "an inclination of temperament or outlook" or an instance of "personal and sometimes unreasoned judgment." (Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/bias> [as of June 27, 2024], archived at <https://perma.cc/7ZG5-RUCU>.) And the phrase "implicit bias" is defined

57.

as "a bias or prejudice that is present but not consciously held or recognized."**3** (Merriam-Webster, *supra* <https://www.merriam-webster.com/dictionary/implicit %20bias> [as of June 27, 2024], archived at <https://perma.cc/949E-V64T>; see *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 829 ["implicit bias can manifest itself in other ways based on unstated or even unconscious assumptions"].)

Here, there was evidence Detective Robles used the phrase "honor killing" during defendant's interrogation. Dr. Sidhu testified Westerners misconceive the notion of honor killing applying whenever a brown man kills a brown woman evidences implicit bias. But the trial court could have reasonably concluded Detective Robles's question related to "honor killing," in context, was a valid investigative inquiry related to understanding defendant's motive and state of mind given defendant's immediately preceding statement that he had to kill himself or the victim at the point she was going to expose herself and defendant's statements that repeatedly put the events leading up to the shooting in context based upon his culture. That is, defendant himself explained the victim's actions and statements, in the context of his culture, were particularly egregious and he had to respond, suggesting there was an expectation, which could be interpreted as a cultural expectation in context, that he kill her or himself. Notably, the prosecution did not discuss honor killing during trial or urge the jury to convict defendant on that basis. Thus, this is not a situation in which we can conclude, if defense counsel objected on the basis of the Racial Justice Act, the trial court necessarily would have concluded the state sought or obtained a criminal conviction or sentence on the basis of race, ethnicity, or national origin. (See § 745, subd. (a).)

Nevertheless, even assuming the court would have found a violation of the Racial Justice Act on this basis, we cannot conclude defendant has established a reasonable

---

**3** Notably, the uncodified declarations of Assembly Bill 2542 state that implicit bias "may" inject racism and unfairness into proceedings similar to intentional bias, suggesting there may be circumstances where implicit bias does not have this effect. (Stats. 2020 , ch. 317, § 2, subd. (i).)

probability the result of the proceeding would have been different in light of the violation. Initially, it bears worth noting that section 745, subdivision (e) provides, "[I]f the court finds, by a preponderance of evidence, a violation of subdivision (a), the court *shall* impose a remedy *specific to the violation* from the following list:

> "(1)   Before a judgment has been entered, the court may impose any of the following remedies:
>
> "(A)   Declare a mistrial, if requested by the defendant.
>
> "(B)   Discharge the jury panel and empanel a new jury.
>
> "(C)   If the court determines that it would be in the interest of justice, dismiss enhancements, special circumstances, or special allegations, or reduce one or more charges.  [¶] … [¶]
>
> "(4)   The remedies available under this section do not foreclose any other remedies available under the United States Constitution, the California Constitution, or any other law."  (§ 745, subd. (e)(1)(A)–(C), (4), italics added.)

And, in the uncodified findings and declarations accompanying the Racial Justice Act, the Legislature declared its intent "not to punish [implicit] bias, but rather to remedy the harm to the defendant's case and to the integrity of the judicial system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (Stats. 2020, ch. 317, § 2, subd. (i).)

Here, since the alleged violation occurred pretrial, before a jury was empaneled and/or evidence presented, and it was apparent on the face of the pretrial record, as defendant concedes, it could have been remedied by redaction of the objectionable statements.  (See § 745, subd. (c) ["A motion made at trial shall be made as soon as practicable upon the defendant learning of the alleged violation.  A motion that is not timely may be deemed waived, in the discretion of the court"].)  Though defendant asserts his counsel should have moved to exclude his entire statement to police on the basis of the alleged violation of the Racial Justice Act, he cites no authority in support of

such a remedy, and we cannot conclude it is reasonably probable such a remedy would have been granted or is appropriate under the Racial Justice Act. Rather, if the trial court had found a violation of the Racial Justice Act based upon Detective Robles's use of the phrase "honor killing" and, potentially the use of the word "honor" generally, during defendant's police interview, the court could have redacted the challenged statements while permitting admission of the remainder of the interview, which was relevant to the disputed issues at trial.[4] (See Cal. Const., art. 1, § 28, subd. (f)(2) ["[e]xcept as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding"]; see generally *People v. Helzer* (2024) 15 Cal.5th 622, 653 [drastic remedy of wholesale suppression of evidence is only warranted in extreme circumstances of flagrant government misconduct]; see also *People v. Lightsey* (2012) 54 Cal.4th 668, 707 [tailoring remedy "'to the injury suffered from the … violation [without] unnecessarily infring[ing] on competing interests'"].) Such a remedy would be "specific to the violation," as required under the Racial Justice Act. (§ 745, subd. (e).)

Furthermore, defendant contends his counsel's failure to object permitted the introduction of the exchange regarding "honor killing," "and the prosecutor's exploitation of implicit bias by playing the DVD of the interrogation at trial[] was proof enough of the elements of premeditation and deliberation required for first degree murder because, as Dr. Sidhu explained, a true honor killing is not impulsive, but is planned and the product of a group decision." But we cannot conclude defendant has established he was prejudiced by the introduction of the reference to "honor killing" and/or the references to "honor" in the interview. As defendant acknowledges, the prosecution did not assert the shooting was an "honor killing" or otherwise encourage the jury to rely on the concept of

---

**4** We note defendant does not argue, nor can we conclude the other specific enumerated remedies detailed in section 745, subdivision (e)(1) would have been appropriate here given that the alleged violation was discoverable pretrial and could be remedied.

"honor killing" to find the shooting was deliberate and premeditated. To the contrary, the prosecution did not reference "honor killing" at all during argument or in its questioning of witnesses. And the defense presented Dr. Sidhu to testify as an expert witness on Punjabi culture. Dr. Sidhu explained the concept of "honor killing" and distinguished the circumstances of the current case. Moreover, without even considering defendant's interview with police, the other evidence established, when firefighters arrived after defendant called 911, defendant told one of them, "'I shoot'" and he handed them bullets; Simi's blood was discovered on defendant's shirt; defendant and the Simi were the only people in the house at the time of the shooting; defendant's gun was stored in his room, so he would have had to go to his room to retrieve it before shooting; Simi was sitting down on the couch and unarmed when she was shot; and defendant shot her three times—once from the back, then he walked around and shot her twice from the front— and all the shots were lethal. On this record, we cannot conclude it is reasonably probable defendant would have obtained a more favorable result even if his counsel had successfully moved to redact the reference to "honor killing" and/or "honor" during the interview.

Accordingly, we reject defendant's claim.

### 3. Fourteenth Amendment Claim

As an alternative argument to his Racial Justice Act claim, defendant generally asserts his interrogation, as translated, infused the trial with implicit bias in violation of his due process, equal protection, and fair trial rights. He does not develop this argument further but contends "[f]or constitutional purposes, the prosecution must show that the implicit bias infusing the trial with the irrelevant but inflammatory honor killing theme was harmless beyond a reasonable doubt." Relying on *Bains v. Cambra* (9th Cir. 2000) 204 F.3d 964, 974 (*Bains*) and *United States v. Cabrera* (9th Cir. 2000) 222 F.3d 590, 596–597 (*Cabrera*), he contends the People cannot make that showing. To the extent the issue was waived, he argues his counsel was ineffective in failing to object on this basis.

We agree with the People that defendant forfeited this argument by failing to raise it below.  (See *People v. Partida* (2005) 37 Cal.4th 428, 437.)  But even if the issue was adequately preserved for our review, we disagree with defendant's contention that the admission of his police interrogation in its entirety, including the exchange regarding whether the shooting was an honor killing, violated his constitutional rights to due process, equal protection, and a fair trial.

"'[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.'"  (*People v. Tran* (2022) 13 Cal.5th 1169, 1209, quoting *People v. Partida, supra*, 37 Cal.4th at p. 439.) "'"'[I]rrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.'" [Citation.]'"  (*People v. Bivert* (2011) 52 Cal.4th 96, 118.)  "'Such evidence violates the Fourteenth Amendment's due process clause when it is so unduly prejudicial that it renders the trial fundamentally unfair.'"  (*Ibid*.)  And a "prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'"  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 110–111.)

Here, we cannot conclude the challenged evidence was so prejudicial or inflammatory that it rendered defendant's trial fundamentally unfair.  During defendant's interview with police, Detective Robles asked one question regarding whether the shooting was an "honor killing."  There was no other discussion of the concept of honor killing in the interview and the prosecution did not introduce any other evidence or argument related to honor killing at trial, nor did it urge the jury to consider a theory of honor killing when deciding defendant's guilt.  The defense also presented an expert who explained the concept of honor killing and that it did not apply to the circumstances of this case.  On this record, we cannot conclude the challenged evidence in this case was so prejudicial or inflammatory that it had the effect of rendering the trial fundamentally

unfair. Rather, we reject defendant's contention his constitutional rights to due process, equal protection, and to a fair trial were violated.

The authorities defendant relies upon are distinguishable. *Bains* involved a Punjabi defendant who was charged and convicted of the murder of his sister's ex-husband. (*Bains, supra*, 204 F.3d at p. 967.) At trial, numerous witnesses for the prosecution testified about the beliefs and customs of the Sikh community with regard to marriage and divorce, including that, "if a husband leaves his wife, his wife is considered to be 'damaged goods' and an 'unmarketable commodity,' thereby causing the families of both spouses great hardship." (*Id*. at p. 970.) An officer for the prosecution, who was qualified as an expert in the Sikh religion and its practices, testified, "in the Sikh community, when a husband in an arranged marriage unilaterally decides to divorce his wife, the family of his wife, especially its male members, would attempt to bring the pair back together, and if the attempt at reconciliation failed, would attempt to exact 'violent revenge or retribution' in order to save face." (*Ibid*.) But the officer also testified "'such escalation was not predictable or inevitable'" and, essentially, that "'Sikhs are no more violent than anyone else [citation].'" (*Ibid*.) Then, in closing arguments, "the prosecutor emphasized these generalizations about followers of the Sikh faith and stated, among other things, 'If you do certain conduct with respect to a Sikh person's female family member, look out. You can expect violence,' and 'What you don't understand, what [the defendant] did understand and wanted [the victim] to understand, was the laws in the United States is [sic] not what we're talking about. We're playing this game by Sikh rules.'" (*Ibid*.) The prosecutor also emphasized the defendant's statements to police regarding the strength of his belief in the Sikh faith and the "wrongness" of the victim's actions towards his sister. (*Ibid*.) The *Bains* court acknowledged that, while most of the testimony and arguments made by the prosecutor involving the Sikh religion related to explaining Sikh beliefs concerning marriage and divorce were offered as a potential motive and to show defendant's intent, "[a] not insignificant portion of the prosecutor's

63.

closing arguments … highlighted the relevant testimony in a way that went beyond merely providing evidence of motive and intent (i.e., without limiting his generalizations about Sikh persons as [the officer] did at the end of his own testimony) and that invited the jury to give in to their prejudices and to buy into the various stereotypes that the prosecutor was promoting." (*Id.* at p. 974.) Accordingly, "the prosecutor relied upon clearly and concededly objectionable arguments for the stated purpose of showing that *all* Sikh persons (and thus [the] defendant by extension) are irresistibly predisposed to violence when a family member has been dishonored … and also are completely unable to assimilate to and to abide by the laws of the United States …." (*Id.* at p. 975.) The *Bains* court held, "It is evident under clearly established federal law that this very kind of conduct by a prosecutor (to the extent that it involves either race or ethnicity) violates a criminal defendant's due process and equal protection rights." (*Id.* at p. 974.) The court explained the prosecutorial arguments "were actually more of a statement about the stereotypical 'nature' of a particular group rather than an explanation of the beliefs followed (to different degrees and in different ways) by some members of that group." (*Id.* at p. 975.)

In *Cabrera*, the Ninth Circuit Court of Appeals reversed two defendants' convictions of crack cocaine offenses based on its conclusion that "at their joint trial the lead detective injected extraneous, prejudicial material, including impermissible references to [the defendants'] national origin" of Cuba. (*Cabrera, supra*, 222 F.3d at p. 591, fn. omitted.) During trial, the lead investigator repeatedly referred to drug activity among "Cubans" in Cabrera's neighborhood and he testified "that the round, flat wafers of cocaine that he purchased from Cabrera were typical of members of the Cuban community," and he had only seen that form of cocaine "in Cuban cases." (*Id.* at pp. 592, 593.) The detective also suggested Cubans tended to be a flight risk. (*Id.* at p. 593.) The *Cabrera* court noted most of the detective's references to Cubans were not relevant and reversal of the defendants' convictions was required under plain error review because the

detective's "repeated references to their Cuban origin and his generalizations about the Cuban community prejudiced [the defendants] in the eyes of the jury." (*Id*. at pp. 596–597.) Specifically, the detective's "repeated references to Cuban drug dealers had the cumulative effect of putting the city['s] …Cuban community on trial, rather than sticking to the facts of [the defendants'] drug offenses." (*Id*. at p. 596.) The *Cabrera* court held appeals to racial, ethnic, or religious prejudice during the course of a trial violates a defendant's Fifth Amendment right to a fair trial, due process rights, and equal protection rights. (*Cabrera, supra*, at p. 594.)

We cannot conclude the conduct at issue here—Detective Robles's question to defendant in the context of the police interview regarding whether it was an honor kill—is comparable to the improper and irrelevant evidence introduced in *Bains* and *Cabrera* and the "clearly inflammatory" prosecutorial arguments in *Bains*. (*Bains, supra*, 204 F.3d at p. 975.) As defendant acknowledges, here, the prosecution did not pursue a theory of honor killing at trial, introduce any other evidence or testimony related to the term, or argue to the jury it should consider the concept of honor killing in determining defendant's guilt. Detective Robles's singular question to defendant during his police interview regarding whether the shooting was an honor killing is markedly different from the repeated improper comments and ethnic generalizations that were introduced through testimony and argument in *Bains* and *Cabrera*. Here, the challenged evidence was not used as a basis to convict the defendant nor can we conclude it amounted to an appeal to ethnic prejudice as was the case in *Cabrera*.

Rather, defendant has failed to establish a violation of his Fourteenth Amendment rights.

## DISPOSITION

The judgment is affirmed.



                                                                    MEEHAN, J.

WE CONCUR:



SMITH, Acting P. J.



DeSANTOS, J.